## THOMAS TUNNEY v. CARNEGIE BROS. & CO.

APPEAL BY DEFENDANTS FROM THE COURT OF COMMON PLEAS
NO. 2 OF ALLEGHENY COUNTY.

Argued November 3, 1891—Decided January 4, 1892
[To be reported.]

(a) In an action against an employer, to recover damages for the death
of an employee, who, as was claimed, while walking across an under-
ground flue connecting the furnace of a battery of boilers with a brick
stack, fell into a hole that suddenly appeared in the top of the flue
and was burned to death, uncontradicted testimony tended to show:

(b) That the flue was strongly built, and was arched over with four
courses of brick, the two lower courses being of the best fire-brick;
that the arch was capable of bearing a heavy weight; that the life of

such a flue was not less than eighteen months, and this one was about six months old, and had been inspected about three months before:

1. No witness being called to condemn, as unsafe and insufficient, the plan on which the flue was constructed, and there being no proof that the defendant had omitted any safeguard ordinarily employed upon flues constructed like the one in question, there was not sufficient evidence of negligence to submit to the jury.

2. The jury could not infer negligence from proof that in other mills a wrought-iron plate was used to cover flues, as a safeguard against such accidents, when there was no evidence as to how the flues so covered were constructed; nor could they infer it upon the simple fact of the appearance of the hole in the flue, from an unexplained cause.

Before PAXSON, C. J., GREEN, CLARK, WILLIAMS and MITCHELL, JJ.

No. 247 October Term 1891, Sup. Ct.; court below, No. 23 April Term 1890, C. P. No. 2.

On January 14, 1890, service was accepted of a summons in trespass, brought by Thomas Tunney against Carnegie Brothers & Co., Limited, to recover damages for the death of the plaintiff's minor son, in consequence of negligence on the part of the defendants. Issue.

At the trial on May 27, 1891, the following facts were shown:

The defendants were the owners and operators of the Edgar Thompson Steel Works, at Braddock, Pa. At these works, there were two batteries of steam boilers, under which natural gas was used as fuel. The furnaces under the boilers were connected by underground brick flues, about four feet six inches wide, with a high stack standing about twenty feet from the boilers. The flues were about fifteen feet apart at the ends next the boilers, and about ten feet apart where they entered the stack. They were so arranged that they could be used separately; and, on the night of April 24, 1889, one of them was undergoing repairs, while the other was in use. At least twenty men and boys were working on and about this repairing, among them the plaintiff's son, John Tunney, a boy seventeen and one half years of age, engaged in wheeling bricks to the place where the repairs were in progress. In so doing, he wheeled his barrow, a part of the time, across the other flue.

Testimony for the plaintiff tended to show that John Tunney disappeared on the night mentioned, and that he was last

### Statement of Facts.

seen about half past ten or eleven o'clock, standing in the boiler-house warming himself, it being a cold, wet night. A witness for the plaintiff testified that, about one or two o'clock A. M., he noticed a hole in the top of the flue, then in use, and a wheel-barrow standing on one side of the flue, a short distance from the hole, and that, at the time he first observed it, the hole was of about the size of an ordinary water bucket.

The plaintiff testified that on the morning of April 25th, about seven o'clock, having heard a report that his son had been burned, he went to the works and saw the hole, then about five feet wide and five feet long; that he looked into the hole, could see to the bottom, and saw, further along the flue, lying at the foot of the stack some bones and a wrought-iron heel-plate, which he recognized as belonging to one of his son's shoes, brought with him from England by the son only about six weeks before, no such plates being in use in this country; that the flue was full of gas and flame, and the witness requested the men who were at work in the establishment at the time, to shut off the fire so that he could get the bones and show them to the coroner; that the men told him it would not save the boy's life to shut the fire off, and his bones would do the witness no good; that, about two o'clock P. M., the witness returned to the works, and the fire was then out; that the witness asked for the use of a step-ladder, that he might go down and get the things he had seen under the stack, but was not allowed to do so; that the workmen " cleaned this place out, to see if there was anything attached to the boy, . . . . and there was only small nails."

The plaintiff testified, further, that the top of the flue where the hole appeared, was "rotten," some of the bricks having been burned to the depth of two or two and one half inches; that " the bricks all were badly burned in the brick-yard, and the bad bricks made the others cave in;" that the plaintiff had worked at blast furnaces for thirty-seven years, and that it was usual to have " a wrought-iron plate that runs over the bricks for protection, so when the bricks will burn you can't go down," but there was no such plate over this flue. On cross-examination, the witness was asked whether his son would not have to cross Turtle creek to get home, and whether the creek was not dragged the next day after the boy's disappearance.

He answered the first inquiry affirmatively; and in response to the second, stated that the creek was dragged by defendant's men for a blindfold, and that it was too shallow for the boy to be drowned in.

The plaintiff's wife and daughter testified that the defendant's foreman brought two small pieces of clothing to them, at their house, in a burned or singed condition, which he said had been picked up near the stack; that they recognized them as parts of the underclothing of John Tunney, which they had mended and washed. The daughter testified that the color of these pieces was just what the color of the clothing, as modified by the action of fire and smoke, would be; that, when washing her brother's clothing the week before, she had noticed a patch, and one piece she identified as belonging to the clothing had in it what "was like a double place" which she thought was a patch; and that the foreman, after he had shown them to the witness and her mother, snatched the pieces of cloth out of the mother's hands and took them away with him. Testifying in his rebutting case, the plaintiff corroborated the statement that the foreman brought two pieces of clothing to plaintiff's wife and daughter, and refused to leave them at plaintiff's house.

For the defendants, their foreman testified that he took but one piece of clothing to the plaintiff's house; that he was not requested to allow it to remain there, and that he took it away because he was trying to run down rumors about it that were flying about the mill; that, by the time he returned to the mill, a shirt had been found that belonged to a cooper employed at the mill, and this piece had come out of and fitted into the sleeve of that shirt; and that it was not an uncommon thing for the men employed in the blast-house, to get their coats or shirts burned and then throw them into the yard.

Other testimony for the defendants tended to show that the flue in question was substantially constructed and arched over with four courses of brick, the two inside courses being composed of the best fire-brick, and that it had ten or twelve inches of earth on the top of it; that it was made strong enough to bear any weight that would come upon it; that it was the duty of a competent man, employed by defendants, to inspect it every time the boilers were "let off," for the purpose of seeing whether the inside was burned away and needed to be replaced; that

Charge of Court below.

it had been repaired from six to seven months before April 24, 1889, and had been inspected perhaps about three months prior to that date ; that the ordinary life of a flue of that kind, in good condition, would vary from a year and a half to three, four, or five years, depending upon the amount of gas used ; that the cause of the falling in of the flue, on the occasion in question, might have been an explosion of gas occurring on the inside of it ; that the hole first appeared about twelve o'clock P. M., attracting immediate attention by reason of the light that shone out from it ; that the plaintiff's son was already missing, and had been for an hour or an hour and a half, when the break in the flue occurred, and the wheel-barrow mentioned in the testimony for the plaintiff had then been standing beside the flue for some time ; that the width of the hole, when it first appeared, was from eight to ten inches, and it was too small for the boy to have fallen entirely into the flue by accident, but its size was afterwards increased ; that, about nine o'clock the next morning, the superintendent gave orders to shut off the gas, which was done, and in the afternoon as soon as the flue was cool, a very careful examination of its contents was made, the ashes which had accumulated in the bottom being sifted through a sieve, but nothing was found except the old nails which had been driven into the wooden arch, used in the construction of the flue, and burned away in the subsequent use of the flue.

The testimony being closed, the court, EWING, P. J., charged the jury in part as follows :

I very gravely doubt, in fact I do not believe (but it is for the jury), that there was any burnt clothing of the boy left, if he went into that flue. It would disappear very promptly in that flame.

The first question with you is was this boy lost in that hole ? Did he fall into that flue where he was working ? If he did, you come to a further question. If he did not, if you do not find that question affirmatively, you need give yourselves no more trouble about it, and your verdict should be for defendants. If he fell into that hole, then the question is, was there negligence on the part of Carnegie Brothers & Co. that contributed to this injury ? In a case of this sort, to entitle the plaintiff to recover

Charge of Court below.

the defendant must have been guilty of negligence which contributed to the injury, and the plaintiff must have been free from negligence. There is no evidence that this boy was guilty of negligence, and therefore the question is, were the defendants guilty of such negligence ? . . . .

If you believe the testimony, the flue was well built, there is no evidence to contradict it; built of good material, and so far as appears, by good workmen, and built in that way, while the materials remained sound, it ought to be—I was going to say—absolutely safe from caving in from any weight that would go on it. Mr. Addenbrook, the superintendent of masonry-work in the Carnegie mills, gives us a very clear and satisfactory account of the way these flues were constructed. . . . . Now, it seems to me that the only question that can arise as to negligence, is whether, taking Mr. Addenbrook's testimony as to the situation and the liability of these flues, from the great heat or the excessive amount of gas in them, to deteriorate the material and weaken it, whether there should not be a substantial covering, independent of the flue, over it, where men can pass; and the court has no opinion to express on that. The plaintiff says that he is accustomed to working in blast furnaces and around them, and has been for a long time, and that it is the usual way to have those flues covered where he has been.

You will bear in mind that in looking at this question of negligence, the defendants are only bound to exercise reasonable care, and that the knowledge acquired after the accident does not, necessarily, relate to what they ought to have known before. We are all very wise after the accident has happened, but reasonable care, under the circumstances, is all that is required, and great peril requires great care and precaution. . . . . .

The court is requested to charge on the part of the defendants :

1. That there is no evidence of any negligence on the part of the defendants, and the verdict must be for the defendants.

Answer : Refused.[1]

2. That, under all the evidence, the verdict must be for the defendants.

Answer : Refused.[2]

—The jury returned a verdict for the plaintiff for $1,000. A rule for a new trial having been discharged and judgment entered, the defendants took this appeal, assigning for error :

1, 2. The refusal of defendants' points.[1] [2]

*Mr. P. C. Knox* (with him *Mr. Edwin W. Smith*), for the appellants :

There was not sufficient evidence to justify the finding that the boy fell into this flue. And upon the subject of negligence of the defendants, the following matters are worthy of discussion :

1. The testimony leaves no doubt that the flue was properly built, and there was no attempt to show that it was not. There was no evidence that such plates as were spoken of by the plaintiff in his testimony, would have prevented such an accident. If these flues were safely built, and care and inspection could make them safe, it was undoubtedly proper to construct them in the way that was followed. Having properly constructed them, and put their inspection in the care of a competent person, the defendants had a right to presume they would remain safe. It is not necessary for an employer to give the employee an absolutely safe appliance or place : Augerstein v. Jones, 139 Pa. 183.

2. Any defect in the flue was, to the defendants as to the boy, a latent defect. It could be seen only by an inspection of the inside. And the defendants were not bound to adopt such a system of inspection as would greatly embarrass their business : Whart. on Negl., § 213 ; Wood's Master & S., 687 ; Phila. R. Co. v. Hughes, 119 Pa. 315. There seems to be no doubt that the inspection of the flues was put in the hands of a competent agent, and there is no evidence that he was negligent. But if he was, the negligence was that of a co-employee : Phila. R. Co. v. Hughes, 119 Pa. 301.

*Mr. T. T. Donehoo*, for the appellee :

1. The evidence is necessarily largely circumstantial, as very probably young Tunney met his death when on duty alone, and it was difficult to extract testimony from defendants' employees. The circumstances shown point to his death by falling into the flue, and there is not the slightest evidence indicating that he lost his life by drowning.

2. As to the defendant's negligence, the testimony of the plaintiff that proper precautions against accidents, by placing

an iron plate over the flue, were not taken, is of direct bearing, and important. Again; the negligence of the defendants in not making regular examinations of the condition of the flues, and in not having an examination made for three or four months prior to the accident, is unaccountable and inexcusable.

OPINION, MR. JUSTICE WILLIAMS:

This appeal raises but one question. The learned judge of the court below was asked to instruct the jury that the evidence was not sufficient to sustain a verdict in favor of the plaintiff. He refused to give the instruction asked for, submitted the whole case to the jury, and a verdict was rendered in favor of the plaintiff. The question thus presented is whether the evidence is sufficient to justify the learned judge in submitting it to the jury.

The action was brought to recover damages sustained by the plaintiff by reason of the death of his minor son, which, he alleged, was due to the negligence of the defendants. His son had recently arrived in this country, was about seventeen years of age, and was a member of his father's family. Both father and son were employed about the Edgar Thompson Steel Works owned by defendants, but in different lines of labor. It appears that there were two parallel flues leading from a battery of boilers to a stack some twenty or more feet away. These flues were from fifteen to twenty feet apart. One of them was closed at the end next the boilers, and was being rebuilt. A party of brick-layers and their helpers, numbering more than twenty men, were at work along this flue, through the night of April 24, 1889. John Tunney and at least two other persons were wheeling brick to them. In doing this they passed sometimes over the flue that was in use. About ten or half past ten o'clock that night, John was seen warming himself at the boilers. He was never seen afterwards. About midnight some of the brick-layers noticed a hole in the flue, and a bright light from it. The hole was then eight to ten inches in diameter, and increased by seven o'clock in the morning, to from twelve to fourteen inches.

The fact of John Tunney's disappearance became known to his father not far from seven o'clock A. M., and he went to the steel works in search of him. No trace of him has been found. A

piece of cloth was found about fifty feet from the stack, which his mother and sister thought they could identify, but this was afterwards accounted for. If it had not been, we agree with the learned judge that the evidence of identification was of no value. It assumed that the flames, which had left no vestige of the bones, the enamel of the teeth, or the steel plates upon the heels of his boots, had spared the piece of flannel with a patch upon it, so that both the texture and the color of the cloth were easily to be distinguished. The father also testified that when he looked into the hole in the flue that morning, he saw, at the foot of the stack, what he thought were bones, and a metal heel-plate, unconsumed. When it is remembered that the foot of the stack was ten feet or more away from the hole, and that the flue was filled with the burning gas and vapor, rushing with great velocity from the boilers to the stack, it is apparent that this story is an improbable one; but, when to this is added the fact that the fire was turned off that forenoon, so that by one or two o'clock the flue was cool enough to admit of a thorough examination of it and its contents, and that nothing was found in the ashes and soot but a few small nails used several months before in rebuilding the arch, its value as evidence disappears altogether.

There is a coincidence between the appearance of the hole in the flue and the disappearance of John Tunney, that suggests the possibility of their relation to each other as cause and effect. On the other hand, there is the circumstance that between twenty and thirty men were at work all night within a few feet of where the hole appeared, and neither saw nor heard anything to suggest to them that any person had fallen into it. This is all there is in the case to prove that John Tunney is dead. Now, if we assume, for the moment, that it is enough to justify the jury in finding that he is dead, and that he lost his life by falling into defendants' flue on the night of the twenty-fourth of April, 1889, we have yet to see what evidence of negligence the jury had before them to justify their verdict. These flues were below the level of the ground. They were about four feet wide, and covered by an arch made of fire-clay brick. There were four rings of brick in the arches, making an arch of eighteen to twenty inches thick over each flue, and twelve to eighteen inches of earth over the arches.

Flues so made have a life of from eighteen months to four
years, depending on the constancy and intensity of the fires.
This arch had been built about six months, and inspected
about three months before the hole opened in it.

In what respect had the defendants failed in their duty in
either the construction or the care of the flue? Several wit-
nesses, thoroughly competent ·to speak upon the subject, say
that the flues were well built, and capable of sustaining a very
great weight. No one denies it. The learned judge who heard
the testimony said to the jury that an arch built like this one
" ought to be—I was going to say—absolutely safe from caving
in from any weight that would go on it." It has not been sug-
gested that the general plan of construction was not a proper
one. We have, then, a flue built upon a proper plan, of the
best-known materials for the purpose, covered with an arch
of great strength, capable of supporting any· load that would
naturally be put upon it by hauling over it. We have the fur-
ther facts, that the flue was comparatively new and had been
recently examined. We cannot see what more could have been
required of an employer. This alleged accident happened in a
part of the state in which iron and steel mills are numerous,
and in which it would have been easy to find a multitude of
witnesses competent to speak upon the safety and sufficiency
of the mode of constructing flues adopted at the defendants'
works. No one was called for that purpose. The plaintiff tes-
tified that in mills where he had worked, a plate of wrought iron
was used to cover the flues. Whether that was in addition to
or in lieu of the arch used by the defendants he did not say.
How the flues were constructed which he had seen with a plate
over them he did not state. The jury were left without any
means of ascertaining whether the defendants had omitted any
safeguard which is ordinarily employed upon flues constructed
like this one or not. The burden of proof was on the plaint-
iff. This was the point on which his case depended. He
should have shown the jury what negligence he charged the de-
fendants with, and in what it consisted. The jury could not
infer it because some flues, of whose construction they were
not informed, had a plate upon them. They could not infer
it from the simple fact that in some way, which no one under-
takes to explain, a hole appeared in the top of the flue on the

same night in which young Tunney disappeared. They certainly could not infer it without any evidence of facts from which such inference would be legitimate. There was therefore no proof of negligence and no proof from which negligence could be fairly inferred in this case, and the instruction asked for should have been given.

The character of the action, the theory on which it rested, and the horrible fate to which it consigned the plaintiff's son, made the case an exceptional and sensational one. It could not fail to enlist the sympathies of the jurors. The fact that the court submitted the question of the defendants' negligence to them was, to their minds, an assurance that there was evidence of negligence sufficient to justify them in finding the defendants guilty of having caused the death of John Tunney by the neglect of such precautions as it was their duty to their employees to take; and they lost no time in finding it. We think there was no evidence, or at least but a mere scintilla, from which negligence could be found, and that the question should not have gone to the jury.

The judgment is reversed.